IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2014 Session

## DENNIS CEDRIC WOODARD, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County**
**No. 14912      Robert Crigler, Judge**

**No. M2013-01857-CCA-R3-PC - Filed September 15, 2014**

The petitioner, Dennis Cedric Woodard, Jr., appeals the summary dismissal of his petition for post-conviction relief and/or petition for writ of error coram nobis as untimely. He asserts that the statute of limitations should be tolled in the interest of justice because he did not learn until well after its expiration that his trial counsel simultaneously represented one of the witnesses against him, Henry Young, without his knowledge. After review, we reverse the summary dismissal and remand for an evidentiary hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Andrew B. Love, Nashville, Tennessee, for the appellant, Dennis Cedric Woodard, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert James Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The underlying facts of the case were recited by this court on direct appeal as follows:

The proof offered by the State demonstrated that on the night of April 13, 2001, the homicide victim, Scott Shafer, was shot near Derry Street in Shelbyville. Earlier that day, at around four o'clock, the victim had been

visiting the home of LaShawn Nunnally. Ms. Nunnally testified that sometime later the [petitioner] arrived at her house carrying a gun. The [petitioner] pointed the gun at the victim and said, "Nigga, are you real or are you fake?" The victim responded to the [petitioner], who was commonly referred to as "Junior," by saying, "Junior, man, quit playing. I'm fucked up." The [petitioner], still pointing the gun at the victim, then repeated his question. At that point, Ms. Nunnally requested that the two men leave the front of her house. The [petitioner] and the victim went to the rear of the house, and Ms. Nunnally followed. She asked the [petitioner] for the gun, and he gave it to her. Immediately thereafter, Jarmaine Hill, Ms. Nunnally's boyfriend, and Mike Jones arrived. Mr. Hill inquired what Ms. Nunnally was doing with the [petitioner]'s gun. She responded that she was trying to "prevent trouble." Mr. Hill then demanded that she return the [petitioner]'s gun, which she did, but she kept the clip that contained the bullets and went back around to the front porch of her house. A few minutes later, the four men came to the front of the house, and the [petitioner]'s mouth was bleeding. When Ms. Nunnally asked what had happened, the victim replied, "I dunked him on his head." The [petitioner] then said to the victim, "Man, you fucked up my grill." Then the [petitioner] smiled at the victim and added, "You are going to remember this tonight." However, Ms. Nunnally testified that the [petitioner] and the victim then hugged, made up, and left together in the victim's car. After all the men left, Ms. Nunnally wrapped the pistol clip in toilet paper and tossed it into a creek.

About two hours later, Ms. Nunnally had gone to another house to visit with friends. Jarmaine Hill and Mike Jones arrived; then a few minutes later, the [petitioner] and the victim drove up. As the day got later, Ms. Nunnally, her two daughters, and the victim decided to walk back to Ms. Nunnally's house to get their jackets. As they returned from getting their coats, the [petitioner] walked up, pointed the gun at the victim, and said, "Nigga, are you ready to die?" The [petitioner] then shot the victim, who fell down. He pulled the trigger several more times, but the gun would not fire because the clip had been removed. The [petitioner], who then ran away, was wearing a yellow shirt, black denim shorts, black Nike shoes, and black socks. Ms. Nunnally ran to a pay telephone and called 911. She then located the victim, who had run a short distance and fallen down, and she applied a blanket to his wound.

On cross-examination, Ms. Nunnally said that the [petitioner] appeared intoxicated while he was at her house. She said that his speech was slurred and he was staggering. He also appeared to be intoxicated when she left her

-2-

friend's house to get the jackets from her house. She said that when the police arrived, she was beside the victim, rendering aid.

Thomas Thompson testified that on the evening of April 13, 2001, he was in his house at 101 Byrd Street. At around 7:40 that night, he heard what sounded like a gunshot. He then looked out his window and saw a white man run between 714 and 716 Derry Street, fall down on the ground, and yell that he had been shot. Then Mr. Thompson looked behind Smith's Food Town on Derry Street and saw a black man in a yellow shirt run behind the store.

James Wheeler testified that at around nine o'clock on the night of April 13, 2001, a young black man, whom he identified as the [petitioner], knocked on his door. Mr. Wheeler testified that the [petitioner] was bleeding from his mouth, and he initially thought that the [petitioner] had been in a car accident. However, the [petitioner] said that he had been beaten up, and he asked to use the telephone. While Mr. Wheeler was inside his house retrieving a cordless phone for the [petitioner], he decided to call 911 to have an ambulance come render aid to the [petitioner]. When Mr. Wheeler went outside to give the [petitioner] the telephone, he observed a car drive up with a young man and woman inside. Mr. Wheeler recognized the driver of the car as a man named Matt Kelly. The [petitioner], who Mr. Wheeler said was "fidgety" and "obviously wanting to leave," got in the car with Mr. Kelly and drove away. On cross-examination, Mr. Wheeler testified that the [petitioner] was having difficulty breathing and speaking because of the condition of his mouth.

David Williams, an officer with the Bedford County Sheriff's Department, testified that he accompanied the ambulance to Mr. Wheeler's residence in response to Mr. Wheeler's 911 call. As he was driving, he passed a white Honda Accord. Upon speaking with Mr. Wheeler, he learned that the subject had left in that car. Officer Williams then followed the Accord to the emergency room parking lot, where he stopped the vehicle. The [petitioner] was in the back seat, and Officer Williams noticed that he had injuries to his face, he had blood down the front of his body, and he was not wearing a shirt. When the officer asked for his name, the [petitioner] replied that his name was Simms. However, the driver of the car, Matt Kelly, told the [petitioner] to tell the truth, and the [petitioner] then told the officer that his name was Junior Woodard. Officer Williams asked another officer, D'Angelo Inman of the Tennessee Highway Patrol, to pat down the [petitioner] for weapons. Officer Inman located a Taurus .40 caliber semi-automatic pistol in the [petitioner]'s

pocket. The weapon had no clip in the grip. Officer Williams then placed the [petitioner] in his patrol car and called for the city police. Officer Williams testified that he smelled alcohol on the [petitioner], but that the [petitioner] was coherent and had no trouble walking. Officer Inman, on the other hand, testified that he did not notice an odor of alcohol about the [petitioner].

Back at the scene of the shooting, Rod Stacey was the patrolman with the Shelbyville Police Department who first arrived. He testified that he located a white male, whom he recognized as the victim, Scott Shafer, lying on the ground in between 714 and 716 Derry Street. Officer Stacey observed an entrance wound and an exit wound in the victim's left arm and an entrance wound in the victim's abdomen. Officer Stacey testified that the victim did not tell him who shot him or the circumstances surrounding the shooting.

Detective Eric Ely of the Shelbyville Police Department arrived on the scene after other officers had already secured the area and begun searching for evidence. He was directed to an area where David Williams of the Bedford County Sheriff's Department had located a shell casing earlier that evening. Detective Ely photographed the cartridge and took it into evidence. He testified that it was the casing of a .40 caliber bullet. At around 10:25 that evening, Detective Ely went to the hospital where other officers had the [petitioner] in custody. There he received the Taurus pistol that Trooper Inman had found in the [petitioner]'s pocket. Detective Ely stated that he read the [petitioner] his rights. Noticing that the [petitioner] had blood on his lip and some of his teeth were dislodged, he asked him, "What happened to your mouth?" The [petitioner] replied, "I didn't shoot anybody." The detective testified that he did not smell alcohol on the [petitioner] during this conversation. Later in his investigation, Detective Ely went to the office of the state medical examiner, where he received the bullet that had been removed from the body of the victim.

Teri Arney is a forensic scientist with the Tennessee Bureau of Investigation. She examined the shell casing found at the scene of the shooting, the bullet extracted from the victim's body, and the handgun found in the [petitioner]'s pocket. She testified that the gun was a Taurus model PT140 .40 caliber semi-automatic pistol. She determined that the bullet and shell casing had been fired and ejected from the [petitioner]'s gun.

Jeff Long is the EMT worker who administered medical aid to the victim. Mr. Long testified that when he encountered the victim, he was pale

and sweating. The victim's lack of color indicated blood loss, and the perspiration indicated that he was beginning to go into shock. These signs suggested that the victim was bleeding internally and needed to be flown via helicopter to Nashville for surgery.

Jeffery Guy is a surgeon at Vanderbilt Hospital who treated the victim. He testified that the victim had extremely low blood pressure when he arrived at Vanderbilt. Despite the efforts of the surgical team, Scott Shafer died from blood loss as a result of gunshot wounds to the spleen, pancreas, and intestines.

Feng Li of the state medical examiner's office performed an autopsy on the victim's body on April 14, 2001. He testified that the victim died of gunshot wounds to different internal organs, and that all of the wounds had been caused by a single bullet. He also testified that no alcohol or drugs were detected in the victim's blood.

Rhonda Hill testified that her son Chris received a letter in May of 2001. She recognized the return address on the envelope as being the Bedford County Jail; so she decided to read the letter. The letter was dated May 23, 2001, the day after the [petitioner]'s preliminary hearing. The letter was from the [petitioner], who referred to himself as "Juvy." In the letter, the [petitioner] stated that a girl named Shawn is "running her mouth."[1] The [petitioner]'s letter asked Chris to prevent Ms. Nunnally from making the June 18 court date, which is the date on which the [petitioner]'s case was presented to the grand jury. Finally, the [petitioner] requested Chris to "hook up with Mickey and burn this bitch house down." After reading the letter, Ms. Hill went to the police station and gave the police the letter. Henry Young, who was in jail with the [petitioner], testified that he observed the [petitioner] writing the letter. Mr. Young testified that after his preliminary hearing on May 22, 2001, the [petitioner] mentioned LaShawn Nunnally's testimony and that it "needed to be taken care of."

After the State rested its case, the [petitioner] testified on his own behalf. He stated that, on the afternoon of April 13, 2001, he had been out riding with the victim, Scott Shafer. The [petitioner] had drunk three quarts of Budweiser beer in thirty minutes when he first joined the victim. After the [petitioner] left the victim's car, the [petitioner] decided to walk to LaShawn Nunnally's house. When he arrived, the victim was already there. The two

---

[1] "Shawn" refers to LaShawn Nunnally.

men exchanged words regarding whether the victim had tried to "holler" at the [petitioner]'s girlfriend. At this point, the [petitioner] testified that his gun was in his pocket. He handed the gun to Ms. Nunnally, and the argument between the [petitioner] and the victim escalated into a fight. The victim punched the [petitioner] in the mouth, and the two wrestled on the ground. During the fight, the [petitioner] suffered a busted lip and lost a tooth. After the fight, the two men apologized to each other, hugged, and left in the victim's car. The [petitioner] stated that when they left, Ms. Nunnally still had the gun.

The [petitioner] and the victim then went to a store, where the [petitioner] bought another quart of beer. After riding around for awhile, the two men returned to Ms. Nunnally's house. When they arrived, Ms. Nunnally and Mike Jones were there. The group was sitting on the front porch talking, when Jarmaine Hill showed up. Mr. Hill and Ms. Nunnally went inside the house for fifteen to thirty minutes. When Mr. Hill came back onto the front porch, he told the [petitioner] that he wanted to speak with him. The two men walked down the street and talked. The [petitioner] testified that when they returned, he sat back down on Ms. Nunnally's front porch. Then the [petitioner] looked up and observed Mr. Hill pointing a gun at the victim. The [petitioner] stated that Mr. Hill shot the victim. Mr. Hill ran away, but the [petitioner] remained on the porch. At that time, Ms. Nunnally approached the [petitioner], said "Here," and handed him the pistol. The [petitioner] took the gun and ran. The [petitioner] said that he ran past Smith's Food Town, and he stopped and knocked on the door of James Wheeler because he did not know how to get to his friend Matt Kelly's house. While he was at Mr. Wheeler's house, Matt Kelly drove up, and the [petitioner] got in his car. The [petitioner] testified that they drove to the hospital because he was concerned about the victim. Later on in his testimony, the [petitioner] admitted writing the letter to Chris Hodge asking him to burn down the house of LaShawn Nunnally "to make her stop lying on [him]."

The defense called Jarmaine Hill as a witness, but he asserted his Fifth Amendment privilege against self-incrimination. Therefore, the trial court declared Mr. Hill unavailable, and the defense called Randall Lottie. Mr. Lottie testified that, while he was incarcerated with Mr. Hill, he heard Mr. Hill say that he killed Scott Shafer. Mr. Hill said that Mr. Shafer owed him money for drugs, and that another person was in jail for his crime.

State v. Dennis Cedric Woodard, Jr., No. M2002-00122-CCA-R3-CD, 2003 WL 169082, at *1-5 (Tenn. Crim. App. Jan. 24, 2003), perm. app. denied (Tenn. May 12, 2003). The

petitioner was convicted of first degree premeditated murder and sentenced to life imprisonment with the possibility of parole. Id. at *1.

The petitioner appealed, and this court affirmed his conviction on January 24, 2003. The Tennessee Supreme Court denied permission to appeal on May 12, 2003. However, the petitioner claims that he did not learn that his application for permission to appeal was denied until March 25, 2005, after he filed a motion to ascertain the status of his case. On April 19, 2005, the petitioner signed his first petition for post-conviction relief, in which he alleged that he received ineffective assistance of counsel. He specifically argued that counsel rendered ineffective assistance by: failing to object or raise as error the trial court's failure to instruct the jury with legal definitions for "intentionally" or "knowingly"; failing to impeach LaShawn Nunnally with prior inconsistent statements she had given; failing to request that the trial court charge the jury with an instruction on impaired capacity relating to Nunnally's testimony and version of events; and making him take the stand and testify against his will. The petitioner asserted that his petition was timely because he did not learn of the Tennessee Supreme Court's denial of his application for permission to appeal until after the one-year statute of limitations had already expired. The post-conviction court disagreed, determining that none of the exceptions for tolling the statute of limitations were applicable, and dismissed the petition. The petitioner admits that he did not file an appeal because "[t]he post-conviction petition was filed Pro Se and I did not know how to appeal the petition."

Years later, on May 10, 2013, the petitioner filed another petition for post-conviction relief. The petitioner asserted that his petition, although untimely, should be considered in the interests of justice because of the "deliberate deception of the petitioner[']s attorney of concealing the conflict of interest of representing and advising a witness to testify against the petitioner without the petitioner[']s knowledge was a circumstance beyond the petitioner[']s control which would justify tolling the statute of limitations." He said that he "was without knowledge of [his] attorney[']s prior representation of [the] prosecution[']s eyewitness against [him]."

Encompassed within the post-conviction petition, the petitioner filed a writ of error coram nobis based on the newly discovered evidence that his trial counsel also represented one of the witnesses against him and advised said witness to testify against him. The petitioner also asserted that counsel rendered ineffective assistance due to the dual representation, as well as by failing to consult with him and prepare for trial, failing to adopt a plausible trial strategy, and failing to advocate plausible alternative theories of defense. The post-conviction court dismissed the petition as untimely, finding that it did not include allegations of fact establishing tolling of the statute of limitations. The court did not appear to rule separately on the petition for writ of error coram nobis.

With the petitioner's current petition, he included a sworn affidavit in which he averred that his "court appointed attorney[,] [counsel,] was in representation of Henry Birlee Young a witness for the prosecution during the course of my trial. Where counsel . . . advised client Mr. Young to testify for the state to possibly receive a lighter sentence without my knowledge." The petitioner claimed in his petition that he "first learned of his counsel[']s multiple representations of the prosecution[']s eyewitness Mr. Young" on May 12, 2012.

The petitioner also included a sworn affidavit from Henry Young signed on May 10, 2012, wherein Young stated:

> I spoke with [the petitioner's trial counsel] concerning [the petitioner's] case prior to me being supeoned [sic] to testify at trial. He asked what I knew about [the petitioner's] case. I told him I didn't know anything.
>
> I did not sign any statements or affidavit regarding [the petitioner's] case.
>
> [Counsel] was representing me on felonie [sic] convictions.
>
> By me testifying at [the petitioner's] trial I did not know how it would affect his case.
>
> [Counsel] did not question me at trial only the D.A. regarding [the petitioner's] case and a letter I did not know the contents of.
>
> [Counsel] told me that by testifying at [the petitioner's] trial that it was possible that they would take it lightly on me at sentencing. Instead of having my sentence double like it could have been it was [e]nhanced to a 3 year sentence from the original 2 years and 1 month I already had.

The petitioner further included portions of the transcript from his trial. During a particular colloquy, counsel told the court, "[Q]uite candidly, our defense is, I didn't do it." At another point in the transcript, the State called a witness to testify about the date of the preliminary hearing in the case. In the judge's chambers, the State explained that it intended to offer a letter into evidence that was allegedly written by the petitioner the day after the preliminary hearing to solicit aggravated arson and/or murder with the intent of concealing the victim's murder. The transcript did not indicate whether the petitioner was present during the discussion. Counsel told the court that "there [wa]s not going to be an objection to the letter itself," then explained:

[T]here is going to be a letter that is going to be introduced by the State that was written by [the petitioner]. We are not going to deny that that letter was written. That letter was written and mailed from the jail, and they have the person who received the letter, intercepted the letter.

The State informed the court that one of its witnesses was a cell mate of the petitioner's who saw the petitioner writing the letter and had a discussion with the petitioner "about the purpose of the letter."

Later, after discussing an evidentiary matter, the following colloquy took place:

[State]: The inmate witness was represented by [counsel]. And I would ask him that as just a routine preliminary question, and absent them going into it, I would not pursue that.

[Counsel]: Our investigators talked to him. We interviewed him.

[State]: On his present conviction, he was represented by [counsel], is what I am meaning to say.

The Court: On the present conviction?

[State]: He is serving a four-year sentence for aggravated burglary that I assume Your Honor or Judge Russell gave him.

[State]: Judge Russell.

[State]: And [counsel] was his lawyer.

The Court: And what question is there?

[State]: I just wanted to alert Your Honor to the fact that I would intend to ask him who his attorney was on his conviction.

The Court: Is there going to be an objection?

[Counsel]: Yeah.

The Court: What would that be relevant to?

[State]:  Do you want to just forego that, or do you want --

[State]:  Well, one thought is -- and the defense might want to cross Mr. Young [the jail inmate] on the issue of whether he was in anticipation of receiving any benefit from the State or testifying for the State as a result of any benefit of bargain.  And the fact [counsel] is his attorney, certainly, if Mr. Young was the recipient of some benefit for his testimony, [counsel] would be privy to that.  And so --

The Court:  Was [counsel] the State's witness' attorney while this case was pending, this one that we are trying?

[Other Defense Counsel]:   I believe so, Your Honor.

[State]:  None of us knew that this was the situation.

[State]:  Mr. Young's knowledge, I mean, it wasn't like it was -- it kind of came along after the fact.  In other words –

[Counsel]:  While this case was pending, I knew nothing about him --

[State]:  Nor did we.

The Court:  If that is the case, there is no reason to complicate the -- the juries think less of lawyers as it is.  To come in and have some insinuation that this lawyer might know something about this case because he represented both of them had nothing to do with this case.

[State]:  It wasn't to insinuate [counsel] knew anything because he obviously didn't.

The Court:  If you say, "Well, didn't [counsel] represent you also," and just stop right there, then the jury is going to be going like I just did.  So that is why it is more the prejudicial -- potential prejudicial effect far outweighs any relevancy that I see at this point.

The transcript of Henry Young's testimony at trial was also included with the petition. Young testified that he was housed in the same cell block of the jail as the petitioner in May of 2001.  Young said that he was aware that the petitioner was in court for his preliminary hearing on May 22, after which the petitioner told Young "[t]hat something needed to be

taken care of" about LaShawn Nunnally testifying. Young stated that he later saw the petitioner write a letter. "He was trying to take care -- get something taken care of with [Nunnally]." Young said that he saw the petitioner writing the letter but did not see the contents of the letter. Young recalled that the petitioner asked him for the spelling of a couple of words. Young identified the letter in court.

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in summarily dismissing his petition for post-conviction relief and/or writ of error coram nobis. He asserts that due process requires tolling of the statute of limitations and that the case should be remanded for an evidentiary hearing. The State asserts that the petitioner's current petition should be treated as a motion to reopen a post-conviction petition and that, because the petitioner failed to comply with the procedural requirements for such, this court is without jurisdiction to hear the appeal. The State additionally asserts that the petitioner's petition for writ of error coram nobis was properly denied as untimely and, moreover, that his claim of a conflict of interest is not cognizable in a petition for writ of error coram nobis. The petitioner responds that "[t]he arguments against reversal are procedural, and would effectively deny [him] due process by foreclosing any opportunity to be heard on claims which clearly have merit."

Post-conviction relief is warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove the factual allegations in support of his or her grounds for relief by clear and convincing evidence. Id. § 40-30-110(f); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law, however, are subject to *de novo* review with no presumption of correctness. Id. at 457.

Under the Post-Conviction Procedure Act, a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a). Unless one of the enumerated exceptions applies, a court does not have jurisdiction to consider an untimely petition. See id. § 40-30-102(b).

Tennessee Code Annotated section 40-30-102(b) states:

(b) No court shall have jurisdiction to consider a petition filed after the expiration of the limitations period unless:

(1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The petition must be filed within one (1) year of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial;

(2) The claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the petition must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid.

Id. § 40-30-102(b)(1)-(3).

In addition, principles of due process may allow for the tolling of the statute of limitations in limited circumstances. See Williams v. State, 44 S.W.3d 464, 468 (Tenn. 2001); Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001); Seals v. State, 23 S.W.3d 272, 279 (Tenn. 2000); Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992). To determine whether due process tolling applies, courts should examine: (1) when the limitations period would normally have begun to run; (2) whether the grounds for relief arose after the limitations period normally would have commenced; and (3) if the grounds are later-arising, would a strict application of the limitations period deny the petitioner a reasonable opportunity to present the claim. Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).

Recently, in Whitehead v. State, 402 S.W.3d 615 (Tenn. 2013), our supreme court discussed due process in a post-conviction context. The court identified three scenarios in which due process requires tolling the post-conviction statute of limitations. Id. at 623. The first of the three circumstances involves claims for relief that arise after the statute of

limitations has expired. Id. The second due process basis for tolling the statute of limitations involves prisoners whose mental incompetence prevents them from complying with the statute's deadline. Id. at 624. The third exception is when attorney misconduct necessitates the tolling of the statute of limitations. Id.

Our supreme court noted that, when a petitioner argues that due process requires tolling the statute of limitations based on the conduct of his or her lawyer, "[a] petitioner is entitled to due process tolling upon a showing (1) that he or she has been pursuing his or her right diligently, and (2) that some extraordinary circumstances stood in his or her way and prevented timely filing." Id. at 631. The court clarified that "pursuing his or her right diligently" did "not require a prisoner to undertake repeated exercises in futility or to exhaust every imagineable option, but rather to make reasonable efforts" to pursue the claim. Id. However, the court emphasized that due process tolling "must be reserved for those rare instances where – due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Id. at 631-32 (internal quotation omitted).

In addition, the Post-Conviction Procedure Act "contemplates" only one petition for relief, and a petitioner may not file more than one petition "attacking a single judgment." Tenn. Code Ann. § 40-30-102(c). If a previous petition is resolved on the merits by a court of competent jurisdiction, a "subsequent petition shall be summarily dismissed." Id. A petitioner may move to reopen the first post-conviction petition only if the motion is based (1) on a constitutional right that was not recognized at the time of trial, (2) on new scientific evidence establishing the petitioner's innocence, or (3) on a sentence enhanced based on a previous conviction that was found to be invalid. Id. § 40-30-117(a)(1)-(3). If the motion to reopen is denied, the petitioner shall have thirty days to file an application in this court seeking permission to appeal. Id. § 40-30-117(c). The application shall include copies of all documents that the parties filed in the trial court and the order denying the motion. Id.

A notice of appeal may be treated as an application for permission to appeal if it includes "sufficient substance that it may be effectively treated as an application for permission to appeal." Graham v. State, 90 S.W.3d 687, 691 (Tenn. 2002). Generally, the application must include "the date and judgment from which the petitioner seeks review, the issue which the petitioner seeks to raise, and the reasons why the appellate court should grant review." Id. When the petitioner fails to follow the statutory requirements seeking review of a denial of a motion to reopen, this court is without jurisdiction to consider the appeal. See John R. Green v. State, No. W2011-01637-CCA-R3-PC, 2012 WL 2336253, at *4 (Tenn. Crim. App. June 19, 2012).

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a

-13-

"slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Our supreme court has stated the standard of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." State v. Vasques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted).

Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault" in failing to present the evidence at the proper time. Harris v. State, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. Id. at 592-93. The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. Vasques, 221 S.W.3d at 527-28.

The statute of limitations for filing a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. See Tenn. Code Ann. § 27-7-103; Mixon, 983 S.W.2d at 667. The statute of limitations is computed "from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). The issue of whether a claim is barred by an applicable statute of limitations is a question of law, which this court reviews de novo. See id. We must construe the coram nobis statute of limitations "consistent with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." Id. The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. Sands v. State, 903 S.W.2d 297, 299 (Tenn. 1995).

However, due process considerations may toll the limitations period. Workman, 41

-14-

S.W.3d at 103. In determining whether tolling is proper, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. Harris, 301 S.W.3d at 145 (citing Workman, 41 S.W.3d at 102). Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford, 845 S.W.2d at 208. To determine whether due process tolling applies, courts should examine: (1) when the limitations period would normally have begun to run; (2) whether the grounds for relief arose after the limitations period normally would have commenced; and (3) if the grounds are later-arising, would a strict application of the limitations period deny the petitioner a reasonable opportunity to present the claim. Sands, 903 S.W.2d at 301.

We have reviewed the petitioner's claims, the record and the applicable law, and we determine that the interests of justice necessitate that the petitioner receive an evidentiary hearing in which to present proof as to his post-conviction and writ of error coram nobis claims. It appears that the petitioner's timely pursuit of relief was first hindered by, if true, his appellate counsel not informing him of the denial of his application for permission to appeal to the supreme court in 2003. Thereafter, the petitioner's filings have been summarily dismissed as untimely. Considering the procedural situation and cumulative claims in this case, the record suggests that the petitioner has been "pursuing his rights diligently" upon learning of such rights, see Whitehead, 402 S.W.3d at 631, and that due process at least requires that the petitioner be afforded the opportunity to present proof as to his claims. However, we note that our determination that the petitioner is entitled to a hearing is not to be read as indicative of the merit of the petitioner's claims, which will be analyzed by the post-conviction and coram nobis court. We also guide the lower court to make findings and rule on both of the petitioner's petitions – post-conviction and writ of coram nobis. Accordingly, we reverse the summary dismissal and remand for an evidentiary hearing.

## CONCLUSION

Based on the foregoing authorities and reasoning, we reverse the summary dismissal and remand for an evidentiary hearing.

_____
ALAN E. GLENN, JUDGE

-15-